UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JUDICIAL WATCH, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF DEFENSE, and CENTRAL INTELLIGENCE AGENCY,**<br><br>Defendants. | Civil Action 12-cv-49 (RC) |

**MEMORANDUM OPINION**

In researching the film that became *Zero Dark Thirty*, two filmmakers spoke with government officials about the search for Osama Bin Laden and the raid on his compound in Abbottabad, Pakistan. The Central Intelligence Agency arranged for the filmmakers to meet with four of its officers who played a role in planning the raid. A Department of Defense official offered to introduce them to a U.S. Navy SEAL who was also involved in the planning. The filmmakers were told the full name of the Navy SEAL, and the first names of the CIA officers.

Judicial Watch, a non-profit organization that promotes government accountability, submitted a Freedom of Information Act ("FOIA") request for all records of CIA and Department of Defense communications with the filmmakers. The agencies produced most of those records, some of which were redacted in places, and withheld others, primarily on the grounds of attorney-client privilege. Judicial Watch does not challenge the withholdings. The only redactions that it challenges are the names of the SEAL and the CIA officers.

Judicial Watch concedes that the names of those individuals would normally be exempt from disclosure. But the organization argues that the government placed their names in the

public domain by revealing them to the filmmakers, and now must provide that information to anyone who requests it. Under the law of this circuit, a FOIA requester who would prevail on that argument must identify "specific information in the public domain that duplicates that being withheld." *Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993). Judicial Watch cannot do so, because the general public does not know the names that the organization would uncover here. Because the government has withheld the names pursuant to a concededly valid FOIA exemption and has not placed them in the public domain, its motion for summary judgment will be granted.

## I.  BACKGROUND

In August 2011, Judicial Watch sent Freedom of Information Act requests to the Central Intelligence Agency and the Department of Defense, seeking all records of communications with Kathryn Bigelow and Mark Boal, respectively the director and screenwriter of "an upcoming film . . . tentatively titled, 'Killing bin Laden.'" Judicial Watch also requested all records of communications with "Megan Ellison and/or any other officer or employee of Annapurna Pictures, the financiers of the film" and "all records concerning, regarding or related to the upcoming film" itself. The time frame for the request was January 1, 2011 through August 9, 2011. Decl. of Martha M. Lutz, Information Review Officer, Director's Area, Central Intelligence Agency (Sept. 14, 2012) ("Lutz Decl."), Ex. A (FOIA Request from Judicial Watch (Aug. 9, 2011)), at 1; Decl. of Mark H. Herrington, Associate Deputy General Counsel, Department of Defense (Sept. 14, 2012) ("Herrington Decl."), Ex. A (FOIA Request from Judicial Watch (Aug. 9, 2011)), at 1. Both agencies replied that they would be unable to respond to the request within twenty days, as FOIA requires. 5 U.S.C. § 552(a)(6); Lutz Decl., Ex. B

2

(Letter from Susan Viscuso, Information and Privacy Coordinator, CIA (Aug. 16, 2011)); Herrington Decl., Ex. B (Letter from Paul J. Jacobsmeyer, Chief, Office of Freedom of Information, Department of Defense (Aug. 22, 2011)).

Judicial Watch filed this suit in January 2012. In May of that year, the Department of Defense produced 153 pages of responsive records, Herrington Decl. at ¶ 4, while the CIA produced sixty-seven responsive documents and withheld twenty-seven, primarily on the grounds of attorney-client privilege, Lutz Decl. at ¶ 9. Both agencies produced additional responsive records that August. Herrington Decl. at ¶ 4; Lutz Decl. at ¶ 9.

A sixteen-page transcript of a background interview with Kathryn Bigelow and Mark Boal (collectively, "the filmmakers") was among the documents that the Department of Defense produced. Herrington Decl. at ¶ 4. Names mentioned by either Mark Boal or Michael Vickers, the Under Secretary of Defense for Intelligence, were redacted from five places in the transcript. The first three redactions occurred in the following exchange:

> Mark Boal: I'll take [NAME REDACTED] or someone like that.
>
> Michael Vickers: Well the basic idea is they'll make a guy available who was involved from the beginning as a planner; a SEAL Team 6 Operator and Commander.
>
> Mark Boal: Are you talking about [NAME REDACTED]?
>
> Michael Vickers: A guy name[d] [NAME REDACTED]. And so, he basically can probably give you everything you would want or would get from Adm[.] Olson or Adm[.] McRaven.

*Id.*, Ex. C (Transcript of Background Interview (July 15, 2011)) ("Background Interview"), page numbered DoD 140. The redacted names are, in order of appearance, (1) the first and last name of a member of the Department of Defense, (2) the rank and last name of another member of the

3

Department of Defense, and (3) the last name followed by the full name—as in "Smith, John Smith"—of a third member of the Department of Defense. *Id.* at ¶ 7. After the filmmakers expressed their pleasure at this arrangement, Under Secretary Vickers went on:

> And so, he'll speak for operators and he'll speak for senior military commanders, because the[y're] all the same tribe and everything, and so you should get most of what you need from him. Now, again the reason Adm[.] Olson and Adm[.] McRaven didn't want to talk is this command conflict of interest. And then with [NAME REDACTED] the only thing we ask is that you not reveal his name in any way as a consultant, because again, it's the same thing, he shouldn't be talking out of school, this at least, this gives him one step removed and he knows what he can and can't say, but this way at least he can be as open as he can with you and it ought to meet your needs and give you lots of color.

Background Interview, page numbered DoD 140. At the end of the interview, Under Secretary Vickers asked "So should I have [NAME REDACTED] reach out to you?" *Id.*, page numbered DoD 153. These redactions are, respectively, the last name of the individual that he mentioned earlier, and the rank and last name of that same person. Herrington Decl. at ¶ 7. The three individuals whose names have been redacted were all assigned to routinely deployable units. *Id.*

Among the documents produced by the Central Intelligence Agency were two internal email chains that contained the names of undercover CIA officers who played a role in planning the Bin Laden operation and later met with the filmmakers. Lutz Decl. at ¶¶ 12, 14–15. The first and last name of one such officer was redacted from the first email chain, and the first names of that officer and three others were redacted from the second chain. *Id.* at ¶¶ 14–15. The CIA explains that "when the meetings with the filmmakers took place at the CIA Headquarters, the guidance provided to the officers who were . . . in sensitive positions was that they should provide the filmmakers with their true first names only." *Id.* at ¶ 12; *see also id.* at ¶ 14 ("To my knowledge, the only redacted information in this email that may have been shared with the

4

filmmakers during the meetings was the first name of one of the officers who is in the email chain's distribution line. This email also contains that officer's last name, but . . . it is my understanding that the officer was instructed not to provide his last name to the filmmakers."); *id.* at ¶ 15 ("The redacted information in these two paragraphs reflects the true first names of four CIA officers who met with the filmmakers. . . . As noted above, it is my understanding that these officers' true first names most likely would have been shared with the filmmakers during the meetings.").

Judicial Watch now challenges the government's authority to withhold the full name and rank of the Navy SEAL mentioned by Under Secretary Vickers and the first names of the four CIA officers who met with the filmmakers. *See* Pl.'s Br. at 6. The parties have filed cross-motions for summary judgment on the question.

## II. LEGAL STANDARD

### A. The Freedom of Information Act

FOIA was enacted so that citizens could discover "what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). FOIA therefore "seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973)). FOIA "is broadly conceived," *Mink*, 410 U.S. at 80, and

its "dominant objective" is "disclosure, not secrecy," *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 494 (1994) (quoting *Rose*, 425 U.S. at 361).

An agency may withhold information responsive to a FOIA request only if the information falls within an enumerated statutory exemption. 5 U.S.C. § 552(b). These "exemptions are 'explicitly exclusive,'" *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (quoting *FAA Adm'r v. Robertson*, 422 U.S. 255, 262 (1975)), and "have been consistently given a narrow compass," *id.* "The agency bears the burden of justifying any withholding, and the Court reviews the agency claims of exemption *de novo*." *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 74 (D.D.C. 2007) (citing 5 U.S.C. § 552(a)(4)(B)). Because the focus of FOIA is "information, not documents . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (citation and internal quotation marks omitted). Instead, FOIA requires that federal agencies provide to a requester all non-exempt information that is "reasonably segregable" from, 5 U.S.C. § 552(b)—that is, not "inextricably intertwined with," *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)—exempt information.

### B. Summary Judgment

FOIA cases are typically and appropriately decided on motions for summary judgment. *Miscavige v. IRS*, 2 F.3d 366, 368 (11th Cir. 1993); *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); *Rushford v. Civiletti*, 485 F. Supp. 477, 481 n.13 (D.D.C. 1980). A motion for summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits its own affidavits, declarations, or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

In a FOIA case, an agency is entitled to summary judgment if it can demonstrate that there are no material facts in dispute as to the adequacy of its search for or production of responsive records. *Nat'l Whistleblower Ctr. v. U.S. Dep't of Health & Human Servs.*, 849 F. Supp. 2d 13, 21 (D.D.C. 2012). An agency must show that any responsive information it has withheld was either exempt from disclosure under one of the exemptions enumerated in 5 U.S.C. § 552(b), or else "inextricably intertwined with" exempt information, *Mead Data*, 566 F.2d at 260. "Because FOIA challenges necessarily involve situations in which one party (the government) has sole access to the relevant information, and that same party bears the burden of justifying its disclosure decisions, the courts . . . require the government to provide as detailed a description as possible—without, of course, disclosing the privileged material itself—of the material it refuses to disclose." *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996).

This justification is typically contained in a declaration or affidavit, referred to as a "*Vaughn* index" after the case of *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). An agency's affidavits or declarations are presumed to be submitted in good faith. *See SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). There is no set formula for a *Vaughn* index, because "the critical elements of the *Vaughn* index lie in its function, and not its form." *Kay v. FCC*, 976 F. Supp. 23, 35 (D.D.C. 1997). The purpose of a *Vaughn* index is "to permit adequate adversary testing of the agency's claimed right to an exemption," *Nat'l Treasury Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 (D.C. Cir. 1986) (citing *Mead Data*, 566 F.2d at 251), and so the index must contain "an adequate description of the records" and "a plain statement of the exemptions relied upon to withhold each record," *id.* at 527 n.9.

### III. ANALYSIS

Judicial Watch concedes that both the first names of the four CIA officers who met with the filmmakers and the full name and rank of the Navy SEAL mentioned by Under Secretary Vickers would normally be exempt from disclosure under FOIA Exemption 3, which authorizes the withholding of matters "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3); *see* 10 U.S.C. § 130b(a) (authorizing the Secretary of Defense to withhold "personally identifying information regarding (1) any member of the armed forces assigned to . . . a routinely deployable unit"); 50 U.S.C. § 3507 (exempting the Central Intelligence Agency from "the provisions of any . . . law which require[s] the publication or disclosure of the . . . names . . . of personnel employed by the Agency"). But Judicial Watch argues that the government released those names into the public domain by sharing them with the filmmakers and now must disclose them to any FOIA requester. *See* Pl.'s Br. at 7–8.

8

"This circuit has held that the government may not rely on an otherwise valid exemption to justify withholding information that is already in the 'public domain.'" *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001). The logic of the public domain doctrine is that "where information requested 'is truly public, then enforcement of an exemption cannot fulfill its purposes.'" *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999)); *accord Prison Legal News v. Exec. Office for U.S. Attorneys*, 628 F.3d 1243, 1253 (10th Cir. 2011) ("The public domain doctrine is limited and applies only when the applicable exemption can no longer serve its purpose."). But before a court can find that the enforcement of an otherwise valid exemption would be pointless, it "must be confident that the information sought is truly public and that the requester [will] receive no more than what is publicly available." *Students Against Genocide*, 257 F.3d at 836 (quoting *Cottone*, 193 F.3d at 555). The D.C. Circuit has therefore held that "[f]or the public domain doctrine to apply, the specific information sought must have already been 'disclosed and preserved in a permanent public record.'" *Id.* (quoting *Cottone*, 193 F.3d at 554); *accord Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) (discussing the plaintiff's obligation to show "that the information he seeks has entered *and remains in* the public domain" (emphasis added)).

Because the public domain doctrine is a doctrine of futility, triggered only when it would serve no purpose to enforce an exemption, it is of almost no use to a plaintiff attempting to learn something that it does not already know. "[A]s a practical matter," successfully invoking the doctrine "yields the FOIA plaintiff little new information." *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 60 n.6 (D.C. Cir. 2003). In fact, the doctrine is "a little odd: if the

9

information is publicly available, one wonders, why is [anyone] burning up counsel fees to obtain it under FOIA?" *Niagara Mohawk*, 169 F.3d at 19; *accord Davis*, 968 F.2d at 1279–80 ("The [Supreme] Court [has] strongly suggested that a public domain rule such as ours is of little significance, because if a requester can establish that the information he seeks is '"freely available," there would be no reason to invoke the FOIA to obtain access to the information.'" (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 764 (1989))).

But a FOIA requester is nonetheless free to press the point. To do so successfully, it must identify "specific information in the public domain that duplicates that being withheld." *Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993) (citing *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)). The burden of production is allocated in this way because "were it otherwise, the government would face the daunting task of proving a negative: that requested information had not been previously disclosed." *Cottone*, 193 F.3d at 554; *accord Niagara Mohawk*, 169 F.3d at 19; *Davis*, 968 F.2d at 1279.

Judicial Watch claims that the five redacted names at issue here are in the public domain, but has not "point[ed] to specific information . . . that duplicates that being withheld," *Public Citizen*, 11 F.3d at 201, much less a "permanent public record" in which those names have been "disclosed and preserved," *Students Against Genocide*, 257 F.3d at 836 (quoting *Cottone*, 193 F.3d at 554). In short, Judicial Watch does not know—and, outside of this suit, apparently has no way of learning—the names of these individuals. That fact is strong evidence that those names are not in the public domain. *See* Pls.' Reply at 2 (arguing that the court should order the names released because the public would benefit from the disclosure).

It is worth noting, however, that the D.C. Circuit has not "establish[ed] a uniform, inflexible rule requiring every public-domain claim to be substantiated with a hard copy simulacrum of the sought-after material." *Cottone*, 193 F.3d at 555. (To do so would be "empty formalism," that court has said. *Id.*) There may not be much flexibility in the public domain doctrine—but there is some, as *Cottone v. Reno* demonstrated. In that case, a FOIA requester sought copies of surreptitiously recorded conversations that had been played at his trial. The court reporter had identified each recording as it was played, but had not transcribed their contents. Reasoning from cases holding that "the common law right to inspect and copy judicial records is indisputable" and "extends to records which are not in written form, such as audio and video tapes," *In re Nat'l Broad. Co.*, 653 F.2d 609, 612 (D.C. Cir. 1981) (footnotes omitted), the *Cottone* court observed that the FOIA requester "ha[d] demonstrated precisely which recorded conversations were played in open court," and concluded that he had therefore "discharged his burden of production by pointing to specific tapes which, having been played in open court and received into evidence, reside in the public domain and mirror precisely the information that he has requested," *Cottone*, 193 F.3d at 555.

*Cottone* holds that information is in the public domain for the purposes of a FOIA request if some other source of law provides a right to access the information. In that (admittedly limited) case, a FOIA requester who seeks information he does not possess can still meet "his 'burden of showing that there is permanent public record of the *exact* [information] he wishes,'" *id.* at 554 (quoting *Davis*, 968 F.2d at 1280 (emphasis added in *Cottone*), by pointing to his right

11

of access to the very information being withheld.[1]  "[V]ery often . . . some type of hard copy facsimile will be the only practicable way for a FOIA requester to demonstrate that the specific information he has solicited has indeed circulated into the public domain," *id.* at 555; *see also Davis*, 968 F.2d at 1280, but "often" is not "always."

In a similar vein, the D.C. Circuit has entertained the argument that there may be "slight variation[s]" on the public domain doctrine. *Students Against Genocide*, 257 F.3d at 836 (quoting party's brief).  In *Students Against Genocide,* an organization seeking reconnaissance photographs (which reportedly showed evidence of an atrocity committed by Bosnian Serbs in the town of Srebrenica) contended that then-Ambassador to the United Nations Madeleine Albright had "waived the government's right to invoke . . . FOIA exemptions by displaying the withheld photographs to the delegates of the foreign governments that are members of the [U.N.] Security Council."  *Id.*  The court quickly disposed of the organization's argument from the public domain doctrine, explaining that:

> The photographs in question here plainly do not fall within that doctrine.  They were not released to the general public; only the Security Council delegates saw them.  In fact, the photographs were not "released" at all.  Although Ambassador Albright displayed them to the delegates, she retained custody, and none left the U.N.

---

[1] Presumably, information is only in the public domain under *Cottone* if the right to access it could be *successfully* invoked.  For instance, "the right to inspect and copy judicial records," *Nat'l Broad. Co.*, 653 F.2d at 613—though "indisputable," *id.* at 612—is "not absolute," *id.* at 613.  Access to those records can be denied if the district court concludes that justice so requires.  *Id.*; *accord United States v. Mitchell*, 551 F.2d 1252, 1260 (D.C. Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978).  If a district court had refused to allow the copying of the recordings sought in *Cottone* (and had not abused its discretion in doing so) then the fact that they had been played at trial presumably would not have availed the FOIA requester.  The question of how a court hearing a FOIA case should assess whether the copying of trial records would have been (or should be) permitted was not addressed by *Cottone* and need not be discussed here.

chamber. Hence there is no "permanent public record" of the photographs. *See Cottone*, 193 F.3d at 554.

*Id.* (citation omitted).

The court then considered the "slight variation" on the public domain doctrine offered by the organization, which contended that "by disclosing the photographs to the members of the Security Council, the government . . . let 'the cat . . . out of the bag,' and whatever damage disclosure might do has already been done." *Id.* (quoting party's brief) (second ellipses in original). This argument sprang from the logic behind the public domain doctrine—that, "where information requested 'is truly public . . . enforcement of an exemption cannot fulfill its purposes,'" *Cottone*, 193 F.3d at 554 (quoting *Niagara Mohawk*, 169 F.3d at 19)—rather than its formal insistence that a disclosure be memorialized in a "permanent public record," *see Cottone*, 193 F.3d at 554; *Davis*, 968 F.2d at 1280.

The *Students Against Genocide* court addressed the argument from principle on its own terms, rather than simply enforcing the formal requirement. It rejected the contention that, having shown the photographs to foreigners, the government was obliged to provide them to Americans, assuming instead that "if the requested photographs are released, they will eventually make their way to foreign governments" which had not previously seen them. *Students Against Genocide*, 257 F.3d at 837. The court credited the assertion that the United States "may have affirmative foreign policy reasons for sharing sensitive information with some foreign governments and not with others," and found it "significant that Ambassador Albright displayed, but did not distribute, the photographs in question," which prevented "professional imagery analysts" from "mak[ing] detailed examinations" that might reveal the "technical capabilities of [U.S.] reconnaissance systems." *Id.* The court therefore concluded that the cat was not out of

13

the bag at all: the release of the photographs could harm national interests by allowing foreign governments which had not seen the images to do so, and could moreover facilitate attempts to learn the technical capabilities of American reconnaissance systems. Because the withholding of the photographs continued to serve a valid purpose, the court enforced the applicable FOIA exemptions. *Id.*

If *Cottone* holds that FOIA requesters may, on rare occasions, use the public domain doctrine to gain information that they do not possess, *Students Against Genocide* suggests that the principle motivating that doctrine—that "where information requested 'is truly public . . . enforcement of an exemption cannot fulfill its purposes,'" *Cottone*, 193 F.3d at 554 (quoting *Niagara Mohawk*, 169 F.3d at 19)—may have implications beyond the simple rule that the government must release information that has been "disclosed and preserved in a permanent public record," *Students Against Genocide*, 257 F.3d at 836 (quoting *Cottone*, 193 F.3d at 554). This is not certain—the opinion also says that "[f]or the public domain doctrine to apply, the specific information sought *must* have already been 'disclosed and preserved in a permanent public record,'" *id.* (quoting *Cottone*, 193 F.3d at 554) (emphasis added))—but the court's willingness to entertain the argument holds the possibility open.

Not that either case does Judicial Watch much good. That organization has not, per *Cottone*, identified any non-FOIA right to the names at issue here. Arguing from the slender opening in *Students Against Genocide*, Judicial Watch encourages the court to adopt the Ninth Circuit's holding that although "the 'public domain' test articulated by the D.C. Circuit is one persuasive way of determining when the government has waived [an exemption] under FOIA, it should not be the *only* test for government waiver." *Watkins v. U.S. Bureau of Customs &*

*Border Prot.*, 643 F.3d 1189, 1197 (9th Cir. 2011) (citation omitted). The additional test propounded by *Watkins* holds that when the government has made "a no-strings-attached disclosure of . . . confidential information to a private third party" it has waived its ability to withhold that information under FOIA, whether or not "the disclosure was . . . preserved in a 'permanent public record.'" *Id.*; *see also id.* at 1198 ("[W]hen an agency freely discloses to a third party confidential information covered by a FOIA exemption without limiting the third party's ability to further disseminate the information then the agency waives the ability to claim an exemption to a FOIA request for the disclosed information.").[2]

Judicial Watch reasons that the disclosures to the filmmakers were made with "no strings attached," *see id.* at 1197—that is, "without limiting the [filmmakers'] ability to further disseminate the information," *id.* at 1198—and that, under *Watkins*, the government has therefore waived its ability to assert Exemption 3. Even if that description of the disclosures were accurate (and it may not be: when Under Secretary Vickers mentioned the Navy SEAL, he emphasized that "the only thing we ask is that you not reveal his name in any way," Background Interview, page numbered DoD 140) it would not be enough to establish waiver in this circuit. The D.C. Circuit has been clear that the enforcement of an otherwise applicable exemption is only pointless when the withheld information is "truly public," *Students Against Genocide*, 257 F.3d at 836 (quoting *Cottone*, 193 F.3d at 555); *Niagara Mohawk*, 169 F.3d at 19, when it "has entered *and remains in* the public domain," *Davis*, 968 F.2d at 1279 (emphasis added). If the filmmakers had publicized the names that they learned and the government now seeks to

---

[2] As a dissenting judge acknowledged, the *Watkins* test is at odds with the precedents of this circuit. *Watkins*, 643 F.3d at 1199 (Rymer, J., concurring in part and dissenting in part) ("I part company only with respect to whether we should adopt the 'public domain' test for waiver embraced by the D.C. Circuit . . . . I think we should.").

withhold, this would be a much harder case, one that might turn on the question of whether those names had been "officially acknowledged." *See Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990). But this is not that case. The names have not been "released to the general public," *Students Against Genocide*, 257 F.3d at 836, and Judicial Watch cannot meet its "initial burden of pointing to specific information in the public domain that duplicates that being withheld." *Public Citizen*, 11 F.3d at 201; *accord Afshar*, 702 F.2d at 1130.[3]

Because Judicial Watch cannot do so, it makes one more effort to amend the public domain doctrine. The organization suggests that official disclosures have been held not to place information in the public domain when they were made for an important governmental purpose. From this premise, Judicial Watch appears to conclude that because the disclosures at issue here were made to assist in the production of a film and not (it says) for any important purpose, they (unlike the others) put information into the public domain. The first problem with this argument is that it is irreconcilable with the doctrine discussed above. Judicial Watch would apparently recast its burden of production as an obligation to either "point[] to specific information in the

---

[3] *McKinley v. Board of Governors of the Federal Reserve System*, 849 F. Supp. 2d 47 (D.D.C. 2012), is not to the contrary. After summarizing the Board of Governors' argument on a question of waiver—the Board "maintain[ed] that . . . publication [of certain records on the website of a congressional committee did] not waive the Board's FOIA exemptions because the records were provided to the [committee] under a written confidentiality agreement that did not authorize public disclosure"—the *McKinley* court held that "[d]isclosures to Congress are not official disclosures within the meaning of FOIA and do not waive an agency's FOIA Exemptions," and neither does "the mere fact that the committee subsequently, and without authorization, published the records." *Id.* at 60. The holding rested on who made the disclosure, and whether it was authorized: if the Board had made an official disclosure within the meaning of FOIA or if it had *authorized* a third party to make such a disclosure, then it would have waived its exemptions. Judicial Watch advocates the inverse rule: that unless an agency *forbids* a third party from disclosing information, then it has waived its exemptions, regardless of whether the third party actually discloses that information. For the reasons discussed above, that position cannot survive an encounter with the law of this circuit.

public domain that duplicates that being withheld" or identify a disclosure that, although not publicly documented, was made for an unimportant reason. As should by now be obvious, that is not the law of this circuit.

And if that were not enough, the second problem with this argument is that it misreads the cases on which it relies. *Students Against Genocide* did not add some "governmental purpose" element to the public domain doctrine, but (as discussed above) simply reaffirmed its roots in the principle that when "enforcement of an exemption cannot fulfill its purposes," there is no point in enforcing it. *Cottone*, 193 F.3d at 554 (quoting *Niagara Mohawk*, 169 F.3d at 19).

In *Muslim Advocates v. United States Department of Justice*, a court in this district held that the Federal Bureau of Investigation had not placed certain chapters of its Domestic Investigations and Operations Guide into the public domain when it showed them to a handful of civil rights and civil liberties groups. Reasoning from *Students Against Genocide*, the court noted that "the disputed chapters were not released to the general public," 833 F. Supp. 2d 92, 100 (D.D.C. 2011), and had not "circulated into the public domain," *id.* at 101 (quoting *Cottone*, 193 F.3d at 555). In a footnote rejecting the argument that the public domain doctrine applied differently in the cases of Exemptions 1 and 7(E), the *Muslim Advocates* court took account of the "circumstances of prior disclosure"—described above—but not its purposes. *Id.* at 102 n.8 (quoting *Carson v. U.S. Dep't of Justice*, 631 F.2d 1008, 1015 n.30 (D.C. Cir. 1980)). Neither of these cases stands for the proposition that disclosures made for an insufficiently important governmental purpose necessarily put information into the public domain.[4]

---

[4] Because the court concludes that the names at issue here were properly withheld pursuant to FOIA Exemption 3, it need not consider the government's argument that the withholding was also proper under Exemption 6. *See Reporters Comm.*, 489 U.S. at 762 n.12 ("Because Exemption 7(C) covers this case, there is no occasion to address the application of

## IV.  CONCLUSION

Although it touches upon matters of considerable public concern, this case presents an exceedingly narrow question: whether a FOIA requester that knows information has been disclosed to a private party is necessarily entitled to that same disclosure.  Under the law of this circuit, the answer to that question is "No."  Otherwise exempt information does not enter the public domain unless it becomes "truly public," which the names at issue here have not.  Because the plaintiff has not carried its "burden of pointing to specific information in the public domain that duplicates that being withheld," the government's motion for summary judgment will be granted.

Rudolph Contreras<br>
United States District Judge

Date: August 28, 2013

---

Exemption 6.").